[Cite as *Lehigh Gas-Ohio, L.L.C. v. Cincy Oil Queen City, L.L.C.*, 2016-Ohio-4611.]

# IN THE COURT OF APPEALS
# FIRST APPELLATE DISTRICT OF OHIO
# HAMILTON COUNTY, OHIO

| | | |
|---|---|---|
| LEHIGH GAS-OHIO, LLC, | : | APPEAL NO. C-150572 |
| | | TRIAL NO. A-1104166 |
| Plaintiff-Appellant, | : | |
| vs. | : | |
| CINCY OIL QUEEN CITY, LLC, | : | |
| and | : | |
| CINCY OIL HOPPLE ST., LLC, | : | |
| Defendants-Appellees. | : | |
| _____ | : | |
| | | TRIAL NO. A-1106892 |
| LEHIGH GAS-OHIO, LLC, | : | |
| Plaintiff-Appellant, | : | *O P I N I O N.* |
| vs. | : | |
| SOLOMON BELAY | : | |
| Defendant-Appellee. | : | |

Civil Appeal From:  Hamilton County Court of Common Pleas

Judgment Appealed From Is:  Affirmed in Part, Reversed in Part, and Cause
Remanded

Date of Judgment Entry on Appeal:  June 29, 2016

*Dinsmore & Shohl, LLP*, and *H. Toby Schisler*, for Plaintiff-Appellant,

*Benjamin, Yocum & Heather, LLC*, *Bradford C. Weber*, *Gary F. Franke Co., L.P.A.*, and *Gary F. Franke*, for Defendants-Appellees.

**DEWINE, Judge.**

{¶1}    This is our second go-round with this dispute.  It involves two properties, which each contain a gas station, an am/pm convenience store and a Subway restaurant.

{¶2}    The owner of the properties, Lehigh Gas, sold the opportunity to operate the sites to Solomon Belay.  The deal went bad quickly—among other things, problems arose when Subway refused to approve Belay as a franchisee.  Litigation ensued.

{¶3}    The trial court initially found that both parties had breached their contracts and ordered Lehigh to return a portion of $300,000 in key money that Belay had put up to run the sites.  Lehigh appealed, and we reversed.  We determined that the court erred in finding that Lehigh had breached by interfering with Belay's attempts to get approved as a Subway and am/pm franchisee.  We sent the matter back to the trial court because the court had not considered other alternative contractual and quasi-contractual theories asserted by Belay.

{¶4}    On remand, the trial court again ordered part of the key money returned, relying upon both contract theory and the principle of unjust enrichment. We find neither theory applicable to the facts before us, so we reverse the court as to the key money.   There are also various issues relating to refunds sought by Belay for security upgrades, inventory and fuel deposits, which we sort out in the opinion that follows.

## I.  Background

{¶5}    The initial framework for the deal was set forth in a nonbinding letter of intent signed by Lehigh Gas-Ohio ("Lehigh") and Belay in April 2010.  Mr. Belay would

pay "key money" for the "business opportunity" to lease multiple properties and operate the gas stations, am/pm convenience stores and Subway restaurants at the locations. Mr. Belay eventually decided to purchase the opportunity to operate two of the four properties listed in the letter of intent—one on Queen City Avenue and one on Hopple Street. He paid $300,000 in key money, which consisted of $200,000 in cash and $100,000 financed through two promissory notes with Lehigh.

{¶6} Mr. Belay set up two limited-liability companies, Cincy Oil Queen City and Cincy Oil Hopple St. (collectively, "Cincy Oil"), to operate the businesses. The parties formalized their arrangement with a set of three agreements for each property: a lease agreement, a management-and-security agreement and a management agreement. The lease provided for an initial five-year term that would be renewable for an additional five years upon Cincy Oil's election. The management-and-security agreement covered the retail-gas sales at the properties. Cincy Oil was to pay a $40,000 fuel deposit ($20,000 per property) and receive commissions for selling Lehigh's gasoline. The management agreement allowed Cincy Oil to sell alcoholic beverages at the convenience stores under Lehigh's liquor permit until the permit was transferred to Cincy Oil. Cincy Oil agreed to provide a monthly accounting of alcohol sales and to send Lehigh an amount equal to the sales taxes tied to alcohol sales. Lehigh would in turn send the taxes to the state. Importantly, none of the agreements referred to the key money.

{¶7} Cincy Oil took over operations in August 2010 upon execution of the agreements. Things went quickly south. Because Belay had not yet been approved as a franchisee of either am/pm or Subway, he operated under Lehigh's franchise agreements. He had received verbal approval of his am/pm franchise application, but his attempt to get approval as a Subway franchisee was not successful. To be approved, Mr. Belay needed to pass a Wonderlic intelligence test, and neither he nor his wife could

manage to do so. Further problems arose involving Cincy Oil's sale of alcoholic beverages at the locations. In violation of the management agreement, Cincy Oil did not provide Lehigh with a monthly accounting of the alcohol sales and did not forward the sales tax payments to Lehigh. Because of this failure, Lehigh sent Cincy Oil a letter in November 2010 stating that it was in default of the management agreement. Lehigh also notified am/pm of Cincy Oil's default, and am/pm rescinded its franchise approval.

{¶8} Despite the default notice, Cincy Oil continued to refuse to send the alcohol sales taxes to Lehigh. Lehigh filed an eviction action, asserting that Cincy Oil's failure to forward the taxes to Lehigh was a breach of the lease. Cincy Oil counterclaimed, alleging breach of contract, tortious interference, fraud and unjust enrichment. After a hearing, the court granted the eviction but held off on determining the remaining claims and counterclaims. Cincy Oil vacated the properties in July 2011, and Mr. Belay stopped paying on one of the promissory notes that he had signed to finance part of the key money. Lehigh filed a breach-of-contract complaint against Belay. Mr. Belay filed counterclaims mirroring the counterclaims filed by Cincy Oil in the eviction action. The eviction case and the breach-of-contract case were consolidated.

{¶9} The trial court held a hearing on the claims that remained following the eviction. After a hearing and a review of briefs, the court issued a decision finding that both parties had materially breached the agreements—Lehigh by interfering with Belay's attempts to get approval as a franchisee of am/pm and Subway, and Belay by failing to forward the alcohol sales taxes. The court determined that Lehigh was entitled to recover $125,019 in alcohol sales taxes. Cincy Oil was to be refunded $99,210.91 for what it paid for inventory, $40,000 for fuel deposits, and $30,000 for safes it had installed to upgrade security at the properties. Additionally, the court concluded that Lehigh should return $67,631.55 for gas commissions that it had withheld from Cincy

Oil. As for the key money that Belay had paid up front for the business opportunity, the court decided that $250,000 should be divided evenly between the parties, so that Lehigh would return $125,000 to Cincy Oil.[1] The net result of the court's determination was that Lehigh owed Cincy Oil $236,823.44. The court also specifically found that there had been no fraud and dismissed Cincy Oil's remaining counterclaims.

{¶10} Lehigh appealed. Cincy Oil did not. In *Lehigh v. Cincy Oil Queen City, LLC*, 1st Dist. Hamilton No. C-130127, 2014-Ohio-2799 ("*Lehigh I*"), we decided that the trial court erred when it determined that Lehigh had breached the parties' contracts by interfering with the franchise-approval process. We noted that "after finding that Lehigh had materially breached the agreements, [the court] declined to consider the defendants' claim for restitution under alternative theories." *Id.* at ¶ 52. Thus, we remanded for the court "to determine whether the defendants would be entitled to a return of any of the 'key money' and deposits, or compensation for the inventory or security upgrades, under the terms of the agreements or under a quasi-contract theory." *Id.*

{¶11} On remand, the trial court concluded that Cincy Oil should recover under two alternative theories—the doctrine of impossibility of performance and unjust enrichment. The court found that "[t]he contract is silent as to what happens to the 'key money' if the assets/'opportunity' cannot be transferred." Despite the contract's silence on the issue, the court determined that "when it became impossible for [Cincy Oil] to become the franchisee and license holder, a reasonable interpretation of the agreement between the parties is that [Cincy Oil] receive a pro rata share of the 'key money' back." The court continued,

---

[1] The trial court apparently reduced the amount Belay had paid in key money ($300,000) by $50,000 to account for the promissory note that he had not yet paid.

Even if [Cincy Oil] could not recover under a contract theory, [it] would be entitled to recover under an unjust enrichment claim. * * * In this case, [Cincy Oil] conferred a benefit on [Lehigh] with the 'key money' and payments for security to the premises and unused inventory. Plaintiff clearly knew of the benefit. And for the reasons discussed above, it would be unjust for [Lehigh] to retain the funds.

{¶12} As a result, the court determined that Lehigh should pay the outstanding gas commissions to Cincy Oil and return four-fifths of the money Cincy Oil had paid for the key money[2], fuel deposits, inventory and safes. The court arrived at the four-fifths share by reasoning that Cincy Oil only had operated the convenience stores for one year out of the initial five-year lease term. The court also concluded that the question of the promissory note debt was resolved by its damages award. Lehigh now appeals, arguing that Cincy Oil was not entitled to damages under either a contract or unjust enrichment theory.

## II. Cincy Oil Isn't Entitled to Return of the Key Money Under a Contract Theory

{¶13} In their counterclaims, Mr. Belay and Cincy Oil alleged that Lehigh had breached the parties' contracts in four ways: failing to transfer liquor permits, interfering with the franchise approvals, failing to work with Cincy Oil with respect to business operations and retaining ATM and gas-revenue commissions, fuel deposits and inventory. In *Lehigh I*, we found that the evidence did not support a finding that Lehigh had interfered with the franchise-approval process. On remand, the trial court did not find that Lehigh had committed any of the other breaches alleged by Cincy Oil in its

---

[2] On remand, the trial court stated that the amount of key money paid was $350,000, but the parties seem to agree that the amount was actually $300,000.

counterclaim. Nonetheless, it found that Belay had a contractual right to a refund of a portion of the key money.

{¶14}   As noted in the trial court's decision, none of the agreements signed by the parties mentions the key money that was provided for in the nonbinding letter of intent. While Lehigh and Cincy Oil agree that the money was for a business opportunity, they disagree about what the business opportunity encompassed. Cincy Oil maintains it paid for the franchises and that, without approval to run the franchises, the contract was void. Lehigh counters that Cincy Oil got what it paid for—the chance to operate the franchises pending approval. Cincy Oil's failure to obtain approval, Lehigh argues, did not invalidate the contract. We think Lehigh has the better argument. There is no evidence in the record that the parties reached any agreement that the key money would be returned in the event that the franchises did not approve Belay as a franchisee. The written agreements between the parties contain no such provision, and there is no evidence that the parties reached any oral understanding that the key money would be returned should things not work out.[3]   Absent an agreement, Cincy Oil cannot demonstrate a breach of contract on Lehigh's part with respect to the key money.

{¶15}   Despite the lack of an agreement, the trial court relied upon the contract doctrine of impossibility of performance to order a refund of the key money. In simple terms, the doctrine excuses performance under a contract because it has been rendered impossible due to the occurrence of an unforeseeable event. *See Mth Real Estate, LLC v. Hotel Innovations, Inc.*, 2d Dist. Montgomery No. 21729, 2007-Ohio-5183. *See also Skilton v. Perry Local School Dist. Bd. of Edn.*, 11th Dist. Lake No. 2001-L-140, 2002-Ohio-6702. The doctrine is an affirmative defense to a breach-of-contract claim. *See*

---

[3] Even if there was evidence of an oral agreement between the parties, we are not convinced the agreement would satisfy the statute of frauds. *See* R.C. 1335.05.

7

*J.I.L. One LLC v. Kemper*, 1st Dist. Hamilton No. C-130555, 2014-Ohio-4932, ¶ 19-20. It cannot be used, as done here, as a means of recovering damages under a contract.

{¶16} Further, the doctrine may only be used to excuse performance under a contract when the event that makes performance of the contract impossible is unforeseeable. *Skilton* at ¶ 28. In this case, the lack of franchise approval was not unforeseeable. Indeed, Mr. Belay acknowledged that when he signed the agreements, he knew he still needed to get Subway's approval, and that he had been told by Subway that it had "every right to approve or disapprove—for any reason—[his] potential to become a Subway franchisee."

{¶17} In essence, the trial court used the doctrine to fill in what it found lacking in the agreements—provision for the refund of money if the deal didn't work out. But "where the terms in an existing contract are clear and unambiguous, [a court] cannot in effect create a new contract by finding an intent not expressed in the clear language employed by the parties." *Alexander v. Buckeye Pipeline Co.*, 53 Ohio St.2d 241, 246, 374 N.E.2d 146 (1978). The parties entered into six separate contracts governing their relationship—none of which expressed any intent for the key money to be returned if the deal went bad. The trial court erred when it used the doctrine of impossibility to create such a term.

### III. Cincy Oil Cannot Show Lehigh was Unjustly Enriched

{¶18} In the alternative, the trial court concluded that Cincy Oil was entitled to damages based on an unjust-enrichment theory. As an initial matter, Lehigh argues that the trial court erred in even considering unjust enrichment because Cincy Oil did not appeal or cross-appeal the trial court's initial decision which dismissed all of Cincy Oil's counterclaims except its breach-of-contract claim. In Lehigh's view, Cincy Oil waived any argument about unjust enrichment, and the trial court could not consider whether

unjust enrichment applied. But Cincy Oil, as the prevailing party, was not required to cross-appeal. *See* App.R. 3(C)(2). And the trial court was required to follow our remand order. *See Nolan v. Nolan*, 11 Ohio St.3d 1, 462 N.E.2d 410 (1984), syllabus ("Absent extraordinary circumstances * * * an inferior court has no discretion to disregard the mandate of a superior court in a prior appeal in the same case."). Thus we conclude that the applicability of unjust enrichment was properly before the trial court on remand.

{¶19} The gist of Cincy Oil's equitable claim was that Lehigh was unjustly enriched by Cincy Oil's payment of key money. To make a case of unjust enrichment, Cincy Oil needed to show that (1) it conferred a benefit on Lehigh, (2) Lehigh was aware of the benefit and (3) it would be unjust for Lehigh to retain the benefit. Here, Cincy Oil clearly satisfied the first two elements: the $300,000 that it gave to Lehigh conferred a benefit of which Lehigh was aware. At issue is the third element—whether Lehigh's retention of the key money in light of the failed business deal was "unjust."

{¶20} "It is not sufficient for the plaintiff to show that it has conferred a benefit upon the defendants. It must go further and show that under the circumstances it has the superior equity so that, as against it, it would be unconscionable for the defendant to retain the benefit." *Cincinnati v. Fox*, 71 Ohio App. 233, 239, 49 N.E.2d 69 (1st Dist.1943). The difficulty in defining what is sufficiently "unjust" to warrant restitution has been addressed in the Restatement:

> In reality, the law of restitution is very far from imposing liability for every instance of what might plausibly be called unjust enrichment. The law's potential for intervention in transactions that might be challenged as inequitable is narrower, more predictable, and more objectively determined than the unconstrained implications of the words "unjust enrichment." Equity and good conscience might see an unjust enrichment

in the performance of a valid but unequal bargain, or in the legally protected refusal to perform an equal one (as where the statute of limitations bars enforcement of a valid debt).

\* \* \*

The concern of restitution is not, in fact, with unjust enrichment in any such broad sense, but with a narrower set of circumstances giving rise to what might more appropriately be called unjustified enrichment. Compared to the open-ended implications of the term "unjust enrichment," instances of unjustified enrichment are both predictable and objectively determined, because the justification in question is not moral but legal. Unjustified enrichment is enrichment that lacks an adequate legal basis; it results from a transaction that the law treats as ineffective to work a conclusive alteration in ownership rights.

Restatement of the Law 3d, Restitution and Unjust Enrichment Section 1 (2011).

{¶21} Cincy Oil cannot show that it had superior equity such that Lehigh's retention of the key money was "unjustified." It was Cincy Oil's breach that brought about the termination of the agreements. And, as we determined in *Lehigh I*, there was no evidence that Lehigh bore legal responsibility for Belay's failure to be approved as a franchisee. Putting the best light on Belay's position, the most that can be said is that he entered into a "valid but unequal bargain"—a circumstance the Restatement tells us is not cause for restitution.

{¶22} We conclude that the evidence does not demonstrate that Lehigh was unjustified in retaining the key money. The trial court's determination that Cincy Oil should recover a portion of the key money under either the doctrine of impossibility of performance or unjust enrichment was error.

### IV. The Contracts Resolve the Question of Fuel Deposits, Inventory and Security Improvements

{¶23} Along with the key money, the trial court also determined that Lehigh should return four-fifths of the amount that Cincy Oil had paid for fuel deposits, inventory and the safes it had installed. The court apparently applied the same logic to these items as it applied to the key money issue: since Cincy Oil had only operated the sites for one-fifth of the lease term, it should get four-fifths of its money back. Although not explicit in its reasoning, the court appears to again rely both on the contract doctrine of impossibility and the alternative concept of unjust enrichment.

{¶24} In doing so, the court overlooked the fact that there were explicit contractual terms covering the fuel deposits, inventory and safes. It is axiomatic that a court cannot create new terms that contradict the terms of the parties' contractual agreements. Similarly, "[i]t is clearly the law in Ohio that an equitable action in quasi-contract for unjust enrichment will not lie when the subject matter of that claim is covered by an express contract[.]" *Ryan v. Rival Mfg. Co.*, 1st Dist. Hamilton No. C-810032, 1981 Ohio App. LEXIS 14729, *3 (Dec. 16, 1981). Thus, rather than invent new contractual terms or rely upon an unjust-enrichment theory, the court should have looked to the terms of the contracts. Our review of these contracts convinces us that only money paid for fuel deposits should be returned to Cincy Oil.

{¶25} Under Section 7 of the Management and Security Agreements, Cincy Oil agreed to pay a $20,000 fuel deposit for each property. According to the agreements, "[t]he deposit shall be returned to [Cincy Oil] ninety days following the termination of this Agreement, subject to the deduction for any sums due [Lehigh] from [Cincy Oil] but unpaid at the time of termination." Lehigh made no claim for any sums to be withheld from the deposit. Consistent with the contract, Lehigh should have returned the $40,000 deposit following the termination of the agreement.

{¶26}   The parties' agreements are also determinative of the question of the inventory and the safes.  Article 8 of the Lease Agreements for both properties provides that

> [u]pon expiration or termination of this Lease, Tenant shall have the right to remove from the Premises * * * any * * * moveable personal property of Tenant, provided that Tenant repair any damage to the Premises or to Landlord's equipment cased by the removal of the same.  If within ten (10) days after expiration or termination of this Lease, Tenant shall have failed to remove any of Tenant's * * * moveable personal property from Premises, Landlord shall automatically become owner of such * * * moveable personal property, and shall have the right to keep, sell in place, or remove the same in any manner.

{¶27}   In the face of such clear contract language, the only question is whether the safes and the inventory were "personal property" subject to the provisions in Article 8.  They were: *Black's Law Dictionary* defines personal property as "any movable or intangible thing that is subject to ownership and not classified as real property." *Black's Law Dictionary* 1254 (8th Ed.2004).   Under the contract, following termination of the lease agreement, Cincy Oil had ten days to remove its personal property, which by definition includes any inventory it had purchased and its safes. When it didn't remove the property, it became Lehigh's, and Lehigh was not required to compensate Cincy Oil for the abandoned personal property.

{¶28}   Thus, we conclude that the court erred when it ordered four-fifths of the money paid for fuel deposits, inventory and safes paid to Cincy Oil.  Instead, Lehigh

must return the full $40,000 paid for fuel deposits. It need not, however, repay Cincy Oil for the inventory and the safes it left behind.

### V. Conclusion

{¶29} We overrule Lehigh's first assignment of error to the extent it challenged the award of the fuel deposits under the contract. In all other respects, we sustain it and the second assignment of error. That leaves us with the following:

- Lehigh is liable to Cincy Oil for:
  - $67,631.55 for gas commissions
  - $40,000 for fuel deposits.
- Cincy Oil is liable to Lehigh for:
  - $125,019 for withheld alcohol sales taxes
  - $31,799.85 plus interest for its default on the promissory note.[4]

We therefore affirm the trial court's judgment in part, reverse it in part, and remand the case to the trial court for entry of judgment in accordance with this opinion.

Judgment accordingly.

**CUNNINGHAM, P.J.,** and **MOCK, J.,** concur.

Please note:

The court has recorded its own entry on the date of the release of this opinion.

---

[4] The part of the trial court's initial order that Lehigh was liable for the gas commissions and Cincy Oil for the alcohol sales taxes was not appealed and remains valid.